UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ANDRE MARTINEZ,<br><br>Plaintiff,<br><br>vs.<br><br>WARDEN OF SOUTH DAKOTA STATE PENITENTIARY,<br><br>Defendant. | 5:22-CV-05043-RAL<br><br><br>OPINION AND ORDER GRANTING MOTION TO DISMISS |

Petitioner Andre Martinez (Martinez) filed this case under 28 U.S.C. § 2254 after pleading guilty to and receiving a 75-year custody sentence for Manslaughter in the First Degree in state court. Martinez's petition concedes that three of the four claims in his § 2254 petition were not raised in prior state court proceedings. Doc. 1. Respondent Warden of the South Dakota State Penitentiary Daniel Sullivan (the Warden) filed a Motion to Dismiss on the Pleadings, Doc. 5, with a memorandum of law, Doc. 6, and the underlying Pennington County files 51CRI19-001105 and 51CIV22-000064. Martinez did not respond to the motion for many months so this Court issued an Order Setting Deadline to Respond. Doc. 9. Martinez's first response noted that he was having trouble with the mail, Doc. 10, and his second response addressed substantive issues, Doc. 11, but did not contest the Warden's argument for dismissal based on failure to exhaust claims and procedural default. This Court nonetheless conducted a thorough review of Martinez's claims and for the reasons explained below grants the Warden's motion to dismiss.

1

## I.     Factual Background

Martinez's conviction arises out of tragic events on February 26, 2019, in Rapid City, South Dakota when Martinez's co-defendant Cole Waters (Waters), senselessly and apparently accidentally, shot and killed seventeen-year-old Emmanuel Hinton as part of a botched effort to steal a small quantity of marijuana. Both Martinez and Waters pleaded guilty to Involuntary Manslaughter and had different versions of what occurred between them in the time leading up to the shooting of Hinton.

The factual basis supporting Martinez's guilty plea contained his version of the events. According to Martinez's factual basis statement, Waters messaged on the afternoon of February 26, 2019, about purchasing a gun from Martinez and sent a photograph of cash from a tax refund. Change of Plea Hearing Transcript, State v. Martinez, CRI 19-1105 (Pennington Cnty. Sept. 29, 2020), at 10–11 [hereinafter Change of Plea Hearing]. Martinez took a Glock handgun to Waters's residence to discuss possible sale of the handgun. Id. at 11. Later Martinez received a message from Chase Bristlin (Bristlin) about Bristlin having five grams of marijuana to sell to Martinez, and Bristlin agreed to come to Waters's address for that transaction. Id. While waiting for the marijuana to be dropped off, according to Martinez, Waters began talking about a previous incident where his cousin had robbed someone during a marijuana buy. Id. Waters suggested that they rob Bristlin; Martinez agreed and continued to text Bristlin to set up the marijuana purchase. Id.

Martinez and Waters awaited Bristlin in the alley outside of Waters's residence. Id. According to the factual basis statement, Waters suggested using the handgun, Martinez responded that it was only five grams of marijuana so why use the gun, Waters agreed but then asked to see and hold the handgun. Id. at 11–12. After Waters talked of robbing his girlfriend's cousins who were in the home, Martinez asked Waters to return the gun, but Waters refused to give it back and

said he would not use the gun. Id. at 12. Bristlin arrived in a car with other occupants and was

sitting in the back seat. Id. Waters approached the vehicle with a red bandana over his face, later

calling Martinez over. Id. Bristlin refused to show the marijuana until he saw the money; Waters

pulled the handgun out and pointed it at Bristlin. Id. at 12–13 The driver tried to accelerate away

but spun out on the ice and the vehicle began to move. Id. at 13. Waters apparently was part way

in the car, the handgun discharged and the front seat passenger, Emmanuel Hinton, was shot in the

head, fatally wounding him.   Id.   Twice during the Change of Plea Hearing, Martinez

acknowledged this version of the facts to be accurate. Id. at 13–14.

Waters testified at Martinez's sentencing hearing, giving his version of the events. Both

Waters and Martinez were 19 at the time, and Waters had met Martinez through work. Sentencing

Hearing Transcript, State v. Martinez, CRI 19-1105 (Pennington Cnty. Dec. 16, 2020), at 6–9

[hereinafter Sentencing Hearing]. Martinez came over to Waters's home between 5:00 and 7:00

p.m. and proposed to Waters stealing marijuana from someone. Id. at 9. Waters agreed to help.

Id. Martinez supplied a handgun to Waters. Id. at 10. A vehicle then came down the alleyway

outside Waters's residence. Id. Martinez confronted Bristlin demanding to see the marijuana, and

Bristlin did not want to show it. Id. at 11. Waters then pointed the gun at Bristlin, the vehicle

started to leave, the gun went off and the front seat passenger was shot in the head. Id. Later that

night, Waters returned the gun to Martinez at Martinez's apartment. Id. at 12. Soon after, Waters

told his parents some version of what occurred, and his parents called the police for Waters to turn

himself in. Id. at 12–13.

Martinez's attorney cross-examined Waters at the sentencing hearing, establishing that

Waters's first two stories to the police—that Martinez fired the fatal shot and then that both of

them fired the gun—were false. Id. at 14–15. Waters admitted that he alone fired the gun but

3

maintained that he did so by accident. Id. at 17. Waters admitted discussing buying the gun with Martinez and having sent Martinez a picture of some cash. Id. Waters had no explanation of why he brandished the gun and agreed that he and Martinez had discussed a "grab and dash" of the marijuana. Id. at 19–21.

Waters and Martinez were arrested and charged with First Degree Murder (Felony Murder), Conspiracy to Commit a Felony, and Attempted First Degree Robbery. On September 29, 2020, Martinez pled guilty to Manslaughter in the First Degree in violation of S.D. Codified Laws § 22-16-15(3). At his plea hearing, Martinez acknowledged that he understood his rights, the charge against him, the maximum penalty, and the consequences of a guilty plea. Change of Plea Hearing at 2–14. The state judge explained to Martinez his trial rights, and Martinez acknowledged he understood them. Id. at 3–5. Martinez understood that his sentence could be up to life in prison. Id. at 6. Several times Martinez affirmed that he was giving up his "right to call and confront witnesses" by pleading guilty. Id. at 6, 8, 10. The factual basis containing Martinez's account was read by his counsel, and Martinez confirmed its accuracy twice. Id. at 13–14. The judge ordered a Presentence Investigation Report and scheduled sentencing for December 16, 2020.

At the sentencing hearing, the prosecutor presented testimony from Waters as summarized above and from twelve family members and friends of the victim. Sentencing Hearing at 6–47. The family members and friends attested to the bright future that Hinton had, the terrible tragedy of his death, and the sense of loss they felt. Martinez's attorney called Keith Martinez (Keith), who is an older half-brother of Martinez and who had completed college at Villanova University and was working in marketing at Black Hills Energy. Id. at 47–48. Keith testified that, despite a troubled upbringing, Martinez was a "great kid" and "sorrowful." Id. at 47–58. Keith described

4

how Martinez grew up in various homes, including in a one-bedroom trailer outside of Kyle on the Pine Ridge Indian Reservation where eight people lived, forcing Keith and Martinez to sleep in the living room. Id. at 49. They hauled water to the home, as there was not running water. Id. Their mother had alcohol problems, Martinez's father was not around, and their stepfather had substance abuse issues. Id. at 51–52. Martinez had a learning ability and struggled with school. Id. at 53. However, Martinez endured and was a 19-year-old student at Rapid City Central High School working night shifts at Taco Bell and living on his own when the homicide occurred. Id. at 54.

Martinez's counsel also presented brief testimony from Molbay Martinez (Molbay), a grandparent of Martinez and cousin to Waters. Id. at 67. Molbay helped Martinez financially, commented on his work ethic, and said he struggled as a mixed race Hispanic-Native American. Id. at 68–70.

The prosecutor argued that Martinez had set up the marijuana deal and brought a gun with ammunition in it, and that Waters's return of the gun after the fact suggested that Martinez was the driving force and smarter kid who planned the crime. Id. at 72–73. The prosecutor noted that Martinez originally did not participate in the presentence interview, had a prior juvenile case involving a stabbing and reportedly had talked with another person about some different idea to steal marijuana. Id. at 74–76. The prosecutor asked that Martinez receive a higher sentence than the actual shooter Waters. Id. at 77.

Martinez's attorney spoke at length at the sentencing hearing seeking a lighter sentence, beginning by arguing that Waters shot the victim and then played the police with various stories and lied. Id. at 79, 84. Counsel argued that Waters was the one masked up with a hood pulled around his head whom Bristlin said approached him insisting to see the marijuana. Id. at 83.

5

Martinez's counsel remarked on Martinez being unique, based on counsel's 46 years of practice, handling of thousands of criminal cases and over a hundred homicides. Id. at 80. Martinez's psychological assessment revealed a difficult childhood, with trauma and physical abuse. Id. at 81. At 19 years of age, Martinez lacked full prefrontal lobe development. Id. at 82. Counsel rationalized Martinez's reluctance to take a plea agreement earlier with a 50-year sentence attached as indicative of his feelings of guilt and accountability, as well as explaining that Martinez's ultimate decision later to accept a plea agreement being motivated by avoiding pain to the victim's family through a trial. Id. at 79–80. Counsel concluded his remarks by noting the irony of the State seeking to punish Martinez more, though he had not been the shooter and took responsibility. Id. at 85.

The sentencing judge then asked about whose idea it was to steal the drugs, commenting on some information that a person named Christian Bowie said Martinez had approached him previously about stealing drugs. Id. at 86. The prosecutor acknowledged that there was a dispute between Waters and Martinez on whose idea it was, but both agreed to the scheme. Id. at 87. The sentencing judge questioned the inconsistency between the psychologist's report and Keith's testimony about whether Martinez had been involved in prior fights, id. at 89, and about Martinez having stabbed a fellow student in a fight at a high school on the reservation. Martinez's counsel responded that Martinez had acted in self-defense and that the stab wound was superficial, consistent with how Keith had testified. Id. at 90; see id. at 56–57. The sentencing judge also expressed concern about what to make of Martinez's statement to the PSI writer that he was doing a community service by getting kids to give up their guns. Id. at 92–94.

Martinez then received his opportunity to speak and spoke briefly, beginning by saying that he understood the feelings of loss experienced by Hinton's family. Id. at 94. Martinez then

6

said: "I know I won't bring the child back, but as the family has said, a life for a life, and I wish you'd consider life." Id. at 95. Martinez's counsel then tried to contextualize Martinez's request for a life sentence as reflective of his remorse, explaining that Martinez originally spurned a plea deal to restrict the judge's sentencing judgment and wanted nothing to do with the PSI until counsel mentioned Martinez possibly needing a competency evaluation. Id. Counsel said that Martinez was not asking for mercy, but that the sentencing judge should disregard Martinez's request for a life sentence and show mercy anyway. Id. at 96.

The sentencing judge seemed to equate Martinez with a gangster, id. at 98, then read into the record the heart-wrenching letter Hinton's mother had written, id. at 99–107, and expressed the belief that Martinez was the "ringleader," id. at 108. The sentencing judge believed that Waters had in fact accidentally discharged the handgun and that both defendants should be sentenced similarly. Id. at 109. The sentencing judge believed a life sentence to be too long because the gun was discharged accidentally. Id. at 110. The sentencing judge ultimately sentenced Martinez to seventy-five years in the State Penitentiary with credit for time served. Id. at 111. Martinez's final judgment of conviction was entered December 30, 2020.

Martinez timely filed a direct appeal to the Supreme Court of South Dakota. First, he argued that his sentence constituted cruel and unusual punishment in violation of the Eighth Amendment. And second, he argued that the sentencing judge abused his discretion in imposing the sentence. The Supreme Court summarily affirmed the sentence on October 12, 2021. The Court held that the issues on appeal were without merit because, 1) the issues are clearly controlled by settled state and federal law, and 2) there was no abuse of discretion. Doc. 6-1.

Three months later, Martinez filed a petition for writ of habeas corpus in state circuit court. Doc. 6-2. He raised twelve grounds for relief:

7

1.  Ineffective assistance of trial counsel for violating his Fifth Amendment right to remain silent, because trial counsel "failed to object to this plea hearing that petitioner was innocent."
2.  Ineffective assistance of trial counsel for violating his constitutional right to confront a witness by failing to rebut the State's witnesses at sentencing and failing to object to "the Judge's prejudicial evidence by . . . suggesting Petitioner's involvement."
3.  Ineffective assistance of trial counsel for failing to raise that the prosecutor was in a sexual relationship with Petitioner's blood relative.
4.  Ineffective assistance of trial counsel for failing to use the State's witness's "rap sheets" for impeachment because "they all had felonies except petitioner."
5.  Ineffective assistance of trial counsel for failing to consider several mitigating factors at sentencing.
6.  Ineffective assistance of trial counsel for failing to challenge the State's gun expert.[1]
7.  Ineffective assistance of trial counsel for failing to challenge the indictment as flawed for vagueness.
8.  Ineffective assistance of trial counsel for failing to object to "prejudicial testimony and evidence" at sentencing.
9.  Ineffective assistance of trial counsel for failing to give Petitioner notice he would have different legal counsel on direct appeal.
10. Ineffective assistance of appellate counsel for failing to give Petitioner notice that he would have different legal counsel on direct appeal.
11. Ineffective assistance of appellate counsel for failing to contact Petitioner during the appellate process.
12. The "cumulative effect" of counsel's "action or inactions taken together" resulted in ineffective assistance of counsel.

The State responded with a motion to dismiss Martinez's petition. Doc. 6-3. The State argued each of Petitioner's claims must be dismissed for failure to state a claim for which relief can be granted. As for each of the claims, the State argued:

1.  Petitioner pled guilty, supported his plea with testimony, and never indicated his trial counsel recommended the plea. Petitioner provided no support for his first claim.
2.  Petitioner willingly gave up his right to confront and cross-examine witnesses when he pled guilty. And this right does not generally apply to sentencing hearings in non-capital cases. Still, Petitioner's counsel did cross-examine the State's fact witness.
3.  The State's only witness at sentencing was Martinez's co-defendant, Cole Waters.

---

[1] No gun expert was involved in the case, as both Martinez and Waters pled guilty and no gun apparently was recovered. The third ground for relief lacked a factual basis.

Petitioner's counsel did attempt to impeach Waters by exposing inconsistencies on cross-examination.

4. There was no plea agreement in place pertaining to sentencing. Petitioner was told the court was not bound by any agreement and the maximum sentence was life in prison.

5. A gun expert was not consulted in this case; there was no merit to this claim.

6. Petitioner pled guilty to a later-filed information, not the original indictment, which was dismissed.

7. The sentencing court was permitted to hear both aggravating and mitigating information at sentencing.

8. This was not a colorable claim, nor does the allegation violate any constitutional rights. Petitioner applied for appellate counsel and was granted appellate counsel.

9. This was not a colorable claim, nor does the allegation violate any constitutional rights.

10. This was not a colorable claim, nor does the allegation violate any constitutional rights.

11. Individually and cumulatively, no facts support this claim.

Id.

The state habeas court applied the standards in Strickland v. Washington, 466 U.S. 668 (1984), and dismissed Martinez's petition because he failed to demonstrate ineffective assistance of counsel.   The order was filed March 15, 2022.   Doc. 6-4. Following the habeas court's decision, Martinez did not file a motion for certificate for probable cause, so no appeal to the Supreme Court of South Dakota occurred from the state habeas relief denial.

Martinez timely[2] filed this federal habeas petition on May 5, 2022. Doc. 1.  He raises four grounds for relief.   First, he argues his Fifth Amendment rights were violated because he was "compelled to answer" the PSI after initially refusing to cooperate.  Doc. 1 at 5.  To support this claim, Martinez attached page 7 of the sentencing transcript, where the sentencing judge informed

[2] State prisoners have only one year to file their federal petitions for writ of habeas corpus.  28 U.S.C.A. § 2244(d)(1); Beery v. Ault, 312 F.3d 948, 950 (8th Cir. 2002).  Martinez's final state judgment was entered December 30, 2020. He filed for direct appeal which was concluded October 12, 2021.  He filed his state habeas petition on January 13, 2022. The state habeas decision was entered March 15, 2022. This petition was filed May 5, 2022. Therefore, the total days tolled for purposes of 28 U.S.C.A. § 2244(d)(1) are 144, well within the one-year statute of limitations.

9

Waters (not Martinez) that prior to sentencing, he cannot be compelled to answer any questions that might incriminate him. Doc. 1-1 at 1. Martinez in his petition acknowledges that this claim was not raised on direct appeal or on state habeas. Doc. 1 at 6.

Second, Martinez argues his Sixth Amendment right to effective counsel was violated because his trial counsel "told the courts that I wanted to take this case to trial." Id. at 7. To support this claim, Martinez attached and circled portions of the sentencing transcript when his counsel explained to the court that Martinez took full responsibility for his actions, did not protest his innocence, did not want to accept any deals, did not want to offer mitigating evidence, and previously expressed a desire to proceed to trial to "air[] in a courtroom" the "relative culpability" between Martinez and Waters. Doc. 1-1 at 3–6. This issue was not raised on direct appeal nor on state habeas by Martinez's own admission. Doc. 1 at 7–8.

Third, Martinez claims a witness—evidently Waters—committed perjury by lying while under oath. Martinez supports this claim by attaching page 14 of the sentencing transcript, containing the cross-examination of Waters and referencing his conflicting stories about who fired the handgun. Doc. 1-1 at 13. This issue was not raised on direct appeal. Although Martinez states that this claim was not raised in state post-conviction proceedings, Doc. 1 at 9–10, Martinez's second, eighth, or twelfth ground in his state habeas petition arguably come close, though do not specifically raise this claim.

Fourth and finally, Martinez claims in his petition that he was not permitted to cross-examine Christian Bowie. To support his claim, Martinez attached page 86 of the sentencing transcript, where the sentencing judge asked counsel about Bowie, a former classmate of Martinez, who allegedly said that Martinez once tried to recruit him to steal drugs. Doc. 1-1 at 14. Bowie did not testify at the sentencing hearing. This issue was not raised on direct appeal. Although

10

Martinez's second, eighth, or twelfth ground in his state habeas petition might be read to encompass this claim, Bowie was not referenced in that state court petition.   Martinez's petition acknowledges that he did raise this claim in his state habeas petition. Doc. 1 at 11.

## II.     Exhaustion and Procedural Default

Federal courts typically cannot consider a state prisoner's habeas claims unless the prisoner has raised and in turn exhausted those claims in state court. O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). Congress codified this requirement in § 2254, making state prisoners "exhaus[t] the remedies available in the courts of the State" before they can obtain federal relief.  28 U.S.C. § 2254(b)(1)(A).  "Ordinarily, a state prisoner satisfies this exhaustion requirement by raising his federal claim before the state court in accordance with state procedures." Shinn v. Ramirez, 142 S. Ct. 1718, 1732 (2022). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U.S. at 845. The exhaustion requirement protects the state courts' role in enforcing federal law, allows state courts the first opportunity to correct possible constitutional defects in state court convictions, and prevents the potentially "unseemly" disruption of state judicial proceedings through premature federal court intervention.  Rose v. Lundy, 455 U.S. 509, 518 (1982) (quoting Darr v. Burford, 339 U.S. 200, 204 (1950)).

These interests in comity and federalism also underlie the procedural default doctrine. Shinn, 142 S. Ct. at 1732; Davila v. Davis, 137 S. Ct. 2058, 2064 (2017).  Procedural default may occur when a prisoner does not properly exhaust his claims in state court. Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc); Wiegers v. Weber, 37 F. App'x 218, 219–20 (8th Cir. 2002) (per curiam).  If the petitioner is barred from raising his claims because "untimeliness or some other state procedural hurdle" prevents him from doing so, then he has technically exhausted

his state court remedies as there are no longer any such remedies available to him. Grass v. Reitz, 643 F.3d 579, 584 (8th Cir. 2011); see also Woodford v. Ngo, 548 U.S. 81, 92–93 (2006) ("In habeas, state-court remedies are described as having been 'exhausted' when they are no longer available, regardless of the reason for their unavailability."). Exhaustion in this sense, however, "does not automatically entitle the habeas petitioner to litigate his . . . claims in federal court." Woodford, 548 U.S. at 93. The petitioner's "procedural default may constitute an independent and adequate state ground barring federal habeas relief," Grass, 643 F.3d at 584 (cleaned up and internal citation omitted), unless the petitioner can show "cause"—meaning "something *external* to the petitioner, something not attributable to him" that hindered compliance with the state procedural rule—and "actual prejudice,"[3] Coleman v. Thompson, 501 U.S. 722, 750, 753 (1991). The procedural default doctrine "ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." Edwards v. Carpenter, 529 U.S. 446, 452–53 (2000) (citation omitted). With this law in mind, this Court turns to the claims in Martinez's federal habeas petition.

### III.    Martinez's Claims Are Procedurally Defaulted

Martinez failed to fully exhaust the claims in his federal habeas petition because he never presented those claims to the Supreme Court of South Dakota. See Ashker v. Leapley, 5 F.3d 1178, 1179 (8th Cir. 1993) ("A claim is considered exhausted when the petitioner has afforded the highest state court a fair opportunity to rule on the factual and theoretical substance of his claim."); Wiegers, 37 F. App'x at 219 (concluding that a petitioner who failed to timely appeal the denial of his habeas petition had not given South Dakota "one full opportunity to resolve any

---

[3]A petitioner can also avoid procedural default by showing "actual innocence," but Martinez does not argue that he can make that showing here. Grass, 643 F.3d at 584.

12

constitutional issue by invoking one complete round of South Dakota's established appellate review process" (cleaned up and citation omitted)). Federal courts sometimes give petitioners a chance to return to state court to present their unexhausted claims, but Martinez has not sought such an option, other than a pending request to the sentencing judge to reduce his sentence. Otherwise, relief to Martinez appears to be procedurally defaulted.

A state habeas petitioner in South Dakota cannot appeal the dismissal of his petition unless the circuit judge or a justice of the Supreme Court of South Dakota "issues a certificate of probable cause that an appealable issue exists." SDCL § 21-27-18.1. Under § 21-27-18.1, the petitioner has thirty days from the date of final judgment to seek a certificate of probable cause from the circuit judge. Id. If the circuit judge refuses to issue a certificate of probable cause, the petitioner may "file a separate motion for issuance of a certificate of probable cause with the Supreme Court within twenty days of the entry of the circuit judge's refusal." Id.

State rules like § 21-27-18.1 will not bar a habeas claim unless they are "firmly established, regularly followed, and readily ascertainable." White v. Bowersox, 206 F.3d 776, 780 (8th Cir. 2000); see also Sloan v. Delo, 54 F.3d 1371, 1379–80 (8th Cir. 1995) (explaining that a state law is "adequate" to bar federal habeas review if the rule is clear, does not "thwart the assertion of federal rights," and is firmly established and regularly followed (citation omitted)). The Supreme Court of South Dakota regularly enforces § 21-27-18.1; it has dismissed untimely motions for a certificate of probable cause, Hannon v. Weber, 638 N.W.2d 48, 50 (S.D. 2001) (per curiam) (explaining that the court "dismisses motions for certificate of probable cause that are untimely filed" even when the motions "are filed only one day late"), and refused to consider an issue because the petitioner, having been denied a certificate of probable cause on the issue by the circuit judge, failed to "file a separate motion with" the court requesting a certificate, White v. Weber,

768 N.W.2d 144, 149 (S.D. 2009) (holding that the court did have jurisdiction to consider the issue). This Court previously has concluded that § 21-27-18.1's requirement that state habeas petitioners file a timely motion for a certificate of probable cause with the Supreme Court of South Dakota is an independent and adequate state law ground that bars federal review. Berry v. Fluke, 4:19-CV-04188-RAL, 2020 WL 6445848, at *5 (D.S.D. Nov. 3, 2020); Thielsen v. Weber, No. Civ. 10-1029-RAL, 2012 WL 844704, at *3 (D.S.D. Mar. 12, 2012).

Martinez is well beyond the deadlines in § 21-27-18.1, so that avenue of presenting his claims to the Supreme Court of South Dakota is foreclosed. Nor can Martinez present his claims to the Supreme Court of South Dakota via a new state habeas petition. South Dakota law bars prisoners from filing a successive habeas petition unless the petitioner identifies newly discovered facts that would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found him guilty or where the petitioner "raises a new rule of constitutional law, made retroactive to cases on collateral review by" the Supreme Court. SDCL § 21-27-5.1. Neither of these exceptions apply to Martinez, so he cannot file a successive petition in state court. Because Martinez has no available means to present his claims to the Supreme Court of South Dakota, these claims are procedurally defaulted. See Miller v. Young, 4:18-CV-04137-KES, 2019 WL 3941256, at *3 (D.S.D. Aug. 21, 2019) (concluding that claims petitioner failed to raise to Supreme Court of South Dakota were procedurally defaulted because any attempt to exhaust the claims now would have been untimely); Duncan v. Dooley, 4:17-CV-04141-KES, 2017 WL 6761928, at *6–8 (D.S.D. Dec. 13, 2017) (concluding that petitioner had procedurally defaulted his claims where § 21-27-5.1 and § 21-27-18.1 would have prevented him from returning to state court and exhausting his claims), report and recommendation adopted, 2018 WL 262831 (D.S.D. Jan. 2, 2018). And Martinez's procedural default bars this Court from considering the claims

14

raised in his federal habeas petition unless he can show cause and prejudice. Grass, 643 F.3d at 584.

### IV.    Martinez Cannot Show Cause and Prejudice

To establish cause to excuse his procedural default, Martinez must "show that some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." Davila, 137 S. Ct. at 2065 (citation omitted). "A factor is external to the defense if it cannot fairly be attributed to the prisoner." Id. (cleaned up and citation omitted). The record here shows that a lack of counsel at the initial-review stage of Martinez's state habeas case is the only possibility he has for showing cause.

The Supreme Court in Martinez v. Ryan, 566 U.S. 1 (2012), recognized a narrow exception to the general rule that ineffective assistance of counsel in state postconviction proceedings does not qualify as cause to excuse a procedural default. Under this exception, courts may find cause to excuse procedural default of a "substantial" claim of ineffective assistance of counsel at trial when state law requires prisoners to raise such claims at the initial-review stage of collateral proceedings and the "cause" consists of there being no counsel or "ineffective" counsel during this collateral proceeding. Trevino v. Thaler, 569 U.S. 413, 423 (2013).

Some of Martinez's filings can be taken as attempts to show cause based on his state appellate attorney's refusal to allow him to raise the claims he wanted on direct appeal. Doc. 1-1 at 10–12. However, "to establish that appellate counsel's failure to preserve an issue for appeal constituted cause for the default, [a] petitioner must first allege in state court a separate claim that his appellate counsel was ineffective for failing to raise the issue and exhaust that claim before he can argue in federal court that it is a reason for excusing the procedural default." Taylor v. Madden, No. ED CV 21-01511 DSF (RAO), 2022 WL 1272396, at *5 (C.D. Cal. Mar. 18, 2022), report

and recommendation adopted, 2022 WL 1266654 (C.D. Cal. April 28, 2022); see also Williams v. Garman, 2:15-cv-06066, 2019 WL 1046024, at *2 (E.D. Pa. Mar. 4, 2019) ("[T]o excuse procedural default of an underlying claim, a claim of ineffective assistance of direct appeal counsel must have been exhausted itself and may not by procedurally defaulted."). The Supreme Court in Davila v. Davis held that a federal habeas court is not allowed to hear a procedurally defaulted claim of ineffective assistance of appeal counsel based on the fact that the petitioner's state postconviction counsel provided ineffective assistance by failing to raise that claim. 137 S. Ct. at 2065–70. Since Martinez did not present any claim of ineffective assistance of appellate counsel to the Supreme Court of South Dakota, such a claim cannot constitute cause to excuse the default of the claims in his federal habeas petition.

Martinez's second claim—that he received ineffective assistance because his trial counsel "told the courts that I wanted to take this case to trial"—also fails to establish cause to excuse his procedural default. As noted above, the Martinez decision requires that an ineffective assistance of counsel claim be "substantial." A claim that trial counsel was ineffective is "substantial" if it has "some merit," meaning that trial counsel's ineffectiveness "must at least be debatable among jurists of reason." Dorsey v. Vandergriff, 30 F.4th 752, 756 (8th Cir. 2022). This Court read the transcripts of Martinez's change of plea and sentencing to evaluate whether there was substantial evidence of ineffective assistance of trial counsel, and this Court found the opposite. Martinez's counsel advocated in a zealous and professional manner for Martinez, properly cross-examining Waters to highlight his initial lies and demonstrate Martinez's relative culpability as being less. Sentencing Hearing Transcript at 14–23. Martinez's counsel properly examined two witnesses who personalized Martinez. After Martinez made a statement of wanting a life sentence and after the sentencing judge and prosecutor raised issues reflecting poorly on Martinez, Martinez's

counsel adroitly addressed the issues to try to mitigate the harm to Martinez.  Id. at 79–96.
Martinez's claims are plainly procedurally defaulted and no certificate of appealability is
justifiable here.

Section 2254 recognizes that "[a]n application for a writ of habeas corpus may be denied
on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the
courts of the State." 28 U.S.C. § 2254(b)(2).  This Court need not reach a decision on the merits
of Martinez's claims under these circumstances but will do so as an alternative reason for dismissal
of the petition.

Congress in the Antiterrorism and Effective Death Penalty Act (AEDPA) limited federal
habeas corpus relief to claims "adjudicated on the merits in State court proceedings" that are either
"contrary to, or involved an unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States," or "resulted in a decision that was based
on an unreasonable determination of the facts in light of the evidence presented in the State court
proceeding." 28 U.S.C. § 2254(d).  Following this language, the Supreme Court of the United
States has stated that federal habeas relief may not be granted for claims unless it is shown that the
earlier state court's decision was either "contrary to, or involved an unreasonable application of,"
clearly established Federal law, or that it "was based on an unreasonable determination of the
facts" considering the record before the state court.  Williams v. Taylor, 529 U.S. 362, 386 (2000);
Harrington v. Richter, 562 U.S. 86, 100 (2011); 28 U.S.C. § 2254(d).  And if a habeas claim "is
based upon a theory which can be determined as a matter of state law, the federal court is bound
by a state court's interpretation of state law."    Clark v. Groose, 16 F.3d 960, 963 (8th Cir. 1994)
(citing Glaze v. Redman, 986 F.2d 1192, 1195 (8th Cir. 1993)).

A conviction following a guilty plea normally rests on the defendant's own admission in open court that he committed the acts with which he is charged. Brady v. United States, 397 U.S. 742, 748 (1970). The plea must be a voluntary and intelligent act, with awareness of the "relevant circumstances and likely consequences."    McMann v. Richardson, 397 U.S. 759, 766 (1970) (quoting Brady, 397 U.S. at 748).    If so, "a plea of guilty in a state court is not subject to collateral attack in a federal court."    Id. at 772.    Here, we have no claim of a coerced confession or an uncounseled defendant.    See id. at 767.    This Court has reviewed Martinez's change of plea hearing, and Martinez voluntarily and knowingly plead guilty.    Change of Plea Transcript at 3–14. Martinez notes that he has dyslexia and mental health issues.    Doc. 11.    But there is no indication that those issues affected his change of plea hearing.

> A defendant who enters such a plea simultaneously waives several constitutional rights, including his privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. For this waiver to be valid under the Due Process Clause, it must be "an intentional relinquishment or abandonment of a known right or privilege."

McCarthy v. United States, 394 U.S. 459, 466 (1969) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). Here, some of Martinez's claims involve constitutional claims, such as the right to confront a witness against him, which Martinez knowingly waived during his change of plea hearing. Change of Plea Transcript at 6, 8, 10; see Boykin v. Alabama, 395 U.S. 238, 243 (1969).

Considering the merits of Mr. Martinez's claims of ineffective assistance of trial counsel at the sentencing hearing, this Court cannot conclude that the state judge handling the state habeas case made any unreasonable application of the facts or incorrectly applied the standards of Strickland v. Washington. This Court, as stated above, conducted its own independent review of Martinez's counsel's performance at the sentencing hearing and found it to be far from ineffective. This Court cannot conclude that the habeas court made an unreasonable application of the facts to

the settled Strickland test.  Indeed, many of the statements of trial counsel to which Martinez directs this Court appear to be efforts to characterize Martinez's behavior as driven by true remorse and to attempt to recharacterize and deemphasize Martinez's insistence that he be punished harshly—"a life for a life."  This Court was also unable to identify any nonfrivolous allegation of deficient performance under the Strickland test.

Considering Martinez's claims for relief more specifically, none of them justify granting a writ under § 2254 on the merits.  First, Martinez asserts that his Fifth Amendment rights were violated because he was "compelled to answer" during the presentence interview process after initially refusing to cooperate.  The sentencing judge actually seemed concerned about this initial choice not to cooperate and Martinez's ultimate cooperation provided information about his difficult upbringing that his brother mentioned in his testimony and his attorney used in seeking some degree of lenience.  His participation was not mandatory though it was encouraged by his counsel to provide the sentencing court with mitigating information prior to sentencing.  And the presentence interview occurred only after Martinez had in fact pleaded guilty, had twice acknowledged the accuracy of his factual basis statement to the Court, and had yielded the presumption of innocence.  While Martinez asserts his counsel's encouragement to participate caused a violation of his Fifth Amendment rights, Martinez did not say anything that was incriminating, though he did make an odd statement about trying to get young people to give up their guns to him.

Second, Martinez claims his Sixth Amendment right to effective counsel was violated because his trial counsel "told the courts that [he] wanted to take this case to trial."  But Martinez offers no support to suggest his attorney's statements were false, and his attorney's statement came as part of the explanation that Martinez ultimately chose to plead guilty to spare pain to the victim's

family. As stated, at the same hearing, Martinez asked the court to impose a life sentence upon him because he believed in "a life for a life." In context, the statement by Martinez's counsel was not ineffective or inappropriate at all, as counsel was trying to explain grounds for lenience despite the harsh penalty Martinez requested.

Third, Martinez claims a witness—presumably Waters—committed perjury by lying while under oath. But the support he offers for this claim is Martinez's counsel's cross examination of Waters, bringing those inconsistencies to light. This certainly is not ineffective assistance of counsel but reflects effective cross-examination.

Finally, Martinez argues he was not permitted to cross-examine Christian Bowie, which is true because Bowie did not testify at the sentencing hearing or otherwise. Martinez gave up his right to a trial where he could cross-examine witnesses, though it would have been unlikely that Bowie would have testified at any trial because he lacked first-hand information about anything that occurred on February 26, 2019. Bowie's name arose as another person whom Martinez ostensibly had asked to participate in a theft of drugs, but the sentencing judge must have known that information to be hearsay on which a sentencing decision ought not to be tethered. The sentencing court simply asked about him, and Martinez's counsel disputed Bowie's claims.

In short, even when considering the merits of Martinez's claims, he still is not entitled to habeas corpus relief. His 75-year sentence is an extremely long one for a 19-year-old anticipating a "grab-and-dash" heist of a small quantity of marijuana and not anticipating that his co-defendant would fire a handgun. But it is not for a federal court to second-guess a state court judge's sentencing decision based on state law, nor does § 2254 provide an opportunity for this Court to do so.

## V.    CONCLUSION

For the reasons contained in this opinion and order, it is

ORDERED that the Warden's motion to dismiss, Doc. 5 is granted and that Martinez's

motion for oral argument, Doc. 4, is denied.  It is further

ORDERED that no certificate of appealability issues.

DATED this   3rd   day of March, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE